[PHILADELPHIA, FEBRUARY 2, 1832.]

## {ALTEMUS *against* ELY.

#### IN ERROR.

An *apprentice* is not within the meaning of the act of the 14th of *February*, 1729-30, supplementary to the "Act for the preventing clandestine marriages" which prohibits clergymen and others from joining in marriage "*indented servants*" without the consent of their masters or mistresses.

ERROR to the District Court for the city and county of Philadelphia.

The plaintiff in error was plaintiff below, and brought this suit as master of an apprentice, against the defendant, a clergyman, to recover the penalty of fifty pounds for marrying the apprentice without his master's consent. This penalty was claimed by the plaintiff, for an alleged violation of the act of assembly, passed the 14th of *February*, 1729-30, entitled, " A supplement to the act, entitled, an act for the preventing clandestine marriages." The only question raised by the record was, whether an apprentice be embraced by the words, " *indented servants*" whom, by that act, justices of the peace, clergymen, *ministers,* or *other* persons, are prohibited from joining in marriage, without the consent of their masters or mistresses.

The court below gave judgment for the defendant, in which error was here assigned.

*P. A. Browne* for the plaintiff in error.

*Chester* and *Chauncey* for the defendant in error.

The opinion of the court was delivered by

KENNEDY, J.—In order to determine the question raised upon this record correctly, it may be well to refer to the words of the original act as well as the supplement. The original act, (1 *Sm. L.* 21,) among other things, declares, that " if any *servant* or *servants* shall procure themselves to be married, without consent of his or her master or mistress, such *servant* or *servants* shall, for such their offence, each of them serve their respective masters or mistresses one whole year, after the time of their servitude by *indenture* or *engagement* is expired. And if any person, being free, shall marry with a servant as aforesaid, he or she so marrying, shall pay to the master or mistress of the servant, if a man, twelve pounds, and if a woman, six pounds, or one year's service ; and the servant, so being married, shall abide with his or her master or mistress according to the indenture or agreement, and one year after as aforesaid." The preamble to the supplement, (1 *Sm. L.* 180,) recites, that " whereas the good intention of an act of

(Altemus *v.* Ely.)

assembly of this province, entitled an act for preventing clandestine marriages, hath been very much eluded, by reason that no proper penalty is, by the said law, imposed upon the justice of the peace or other persons marrying or joining in marriage any persons, contrary to the intent and meaning of the said act: For remedying whereof, be it enacted, that no justice of the peace shall subscribe his name to the publication of any marriage within this province, intended to be had between any persons whatsoever, unless one of the persons at least lives in the county, where such justice dwells, and unless such justice shall likewise have first produced to him a certicate of the consent of the parent or parents, guardian or guardians, *master* or *mistress* of the persons whose names or banns are to be so published, if either of the parties be under the age of twenty-one years, or under the tuition of their parents, or be *indented servants,* &c.   The second section then imposes a forfeiture of fifty pounds upon every justice of the peace, clergyman, minister or other person, who shall join in marriage contrary to the provisions of these acts, " to be recovered in any court of record within this commonwealth by bill, plaint or information by the person or persons *grieved,* if they shall sue for the same."

It has been urged by the counsel for the plaintiff in error, that the term " servant" in legal acceptation at least embraces an *apprentice :* That this appears not only from *Jacob's Law Dictionary,* but from *Viner, Blackstone* and others, who have classed apprentices with servants ; have treated of them as a species of servants and laid down the law in respect to them under the title of " master and servant."   This argument, if it prove any thing, proves more than the plaintiff claims, because it is admitted on his part that hirelings are not embraced within either of the acts, yet nothing is more certain than that they are embraced within the generic term " servant" in its legal signification.     But, I think it apparent from the phraseology of these acts, that it was not the intention of the legislature to employ the term " servant" in its legal generic sense, and more especially in the supplementary act, which is the one that imposes the penalty.   The original act declares, that if servants shall procure themselves to be married without the consent of their masters or mistresses, they shall for such offence, " serve their respective masters or mistresses *one whole year* after the time of their servitude by *indenture* or *engagement* is expired."   The terms employed in the supplementary act are " *indented servants*" which are more definite and perhaps more restrictive than the phraseology used in the original act.   The supplement is in positive terms confined to the cases of *indented servants,* and I will not say but what this ought to be considered as explanatory of the description of servants intended to be embraced by the first act, and that neither was intended to be extended to others than *indented servants.*   For the preamble to the supplement would seem to indicate that its design was to provide a suitable punishment for those who should join such ser-

(Altemus *v.* Ely.)

vants in marriage, as were prohibited from marrying by the original act under a penalty of having their term of servitude extended one year beyond the time of their *indenture* or *engagement.* These acts, although it may be said, that in one point of view they are remedial, yet it must be admitted, 1 think, they are highly penal, for by the provisions of the first act, the servant, who offends against it, is made to serve his master or mistress one whole additional year, whether the master or mistress shall have sustained damage or not by the servant's marrying without consent. And the supplementary act, the person, who joins an *indented servant* in marriage, is made to pay fifty pounds to the party grieved, that is, the master or mistress, whether he or she shall have sustained any *actual* damage by it or not. I am therefore inclined to believe that in the construction of these acts, we are bound to confine ourselves to what shall appear to have been clearly and manifestly the intention of the legislature in passing them; and that this intention must be collected from the various parts of these acts taken together, and the terms used therein, as also from other acts passed about the same time and subsequently, in relation to servants and apprentices, and not from our own notions of what may or ought to be considered as existing evils at the present day on this subject, and therefore proper to be considered as coming within the purview of these acts.

I think it may be safely affirmed, that at no period in *Pennsylvania,* has the term " servant" in common parlance been extended to an apprentice. An apprentice has ever been considered as having and maintaining a higher stand or grade in society than him, who is commonly denominated a *servant.* This distinction too will appear to have been taken and to have rested on the mind of our legislative body, as often as its attention has been turned to servants and apprentices, and it has thought proper to legislate upon the subject. A reference to these acts will furnish the most abundant proof that whenever the legislature intended to pass or make any provision, which was intended to embrace apprentices, that they have uniformly named them *specifically;* and no instance, I think, can be found in any act of assembly where the two terms are used as synonimous.

In the year 1700, (1 *Sm. L.* 10,) a little before the passage of the first act involved in this case, an act entitled, " An act for the better regulation of *servants* in this province and territories," was passed. The term " servants" without any epithet of *qualification* or *restriction,* is used in this act throughout, yet it has never been supposed, that *apprentices* were embraced within its provisions; certainly in practice they have not. The third section gives freedom dues such as are therein specified, to those servants who shall have served faithfully for four or more years. Among the articles specified as freedom dues are one *new axe, one grubbing hoe* and *one weeding hoe,* things that would be of little or no use whatever in almost every trade, art or mystery that is learned in the character of an apprentice. The fourth section imposes a penalty of five days service upon

(Altemus *v.* Ely.)

" *any servant*," who shall absent himself from his master's service, without his consent, for every day that the servant shall so absent himself, and such further satisfaction as the county court shall see meet, who are also to order the additional time to be served.   Sons of the most respectable citizens within this state, as well during the time it was a province, as since, have been bound out to learn some art, mystery, trade or occupation, such as that of husbandman, merchant, or some of the mechanic arts.   Indeed, it is as likely as not that some of the sons of these very legislators themselves, who made some of these laws, were so bound out as apprentices ; and can it be imagined, that they intended such regulations for apprentices ? Most certain it is that in practice they have never been so applied, which is at least strong, if not conclusive evidence of the original design of these acts.   By a supplement to this act passed as late as the 9th of *March*, 1771, (1 *Sm. L.* 321,) a summary remedy is provided to enforce some of the provisions contained in the original act without the least alteration of phraseology, showing, that apprentices or their masters were not intended to be embraced.

That the term " servants" as used in these acts, was not intended to embrace *apprentices*, will appear still more clearly, if possible, from acts passed, providing for them *eo nomine :* For by reference to these acts, we shall find, that apprentices have not escaped the attention of the legislature, but have been provided for expressly by *name*, and that some of the provisions in respect to *apprentices* are substantially, if not *verbation*, the same with some of these which were in being at the time, for *servants*, which would have been altogether unnecessary, if they had been previously embraced under the term and idea of their being " *servants*."   By an act passed *March* 27th 1713, (1 *Sm. L.* 81,) Orphan's courts were established and by the seventh section of the act, (page 84,) were authorised upon the application of the executors or administrators of persons dying and leaving minor children, without regard to the value or amount of the estate, which was left or descended to such children, or upon the application of the guardians or tutors of orphan minor children, " to order and direct the binding or putting out of them *apprentices* to trades, husbandry, or other employment, as shall be thought fit," subject, however, to some restrictions mentioned in the 12th section of the act, which go to prove the great care and attention that the legislature had for *apprentices* above *servants*.   By this section they were not to be bound to persons whose religious persuasion was different from what the parents of such orphan or minor professed at the time of their decease, or against the minor's own mind or inclination, so far as he or she had discretion and capacity to express or signify the same : or to persons that were not of good repute, so as others of good credit and of the same persuasion, might or could be had.   But very different was the law as to servants, who at this time were liable to serve any body, and to be transferred from hand to hand, so that they were not disposed of to persons residing out of

the state, without their consent, or any regard paid to the religious profession or even the moral character of the master.   On the 4th of *March*, 1763, " An act for the regulation of *apprentices* within this province," was passed, which was afterwards on the 29th of *September*, 1770, repealed by an act of that date, entitled " An act for the regulation of apprentices within this province," (1 *Sm. L.* 309.)  The preamble to this act recites, that " Whereas great mischiefs and losses have been sustained by the masters or mistresses of apprentices within this province for *want of some law to regulate* their conduct and behaviour during their *apprenticeships* (not *servitudes*) to *prevent their absenting themselves from their* said *masters* or *mistresses' service* without leave, to punish them for any disorderly, immoral behaviour, and to make the covenants between them mutually obligatory ;  For remedy whereof, &c."   The state of things referred to and recited in this preamble must be considered as true, and if so, the act of 1700 for the *better regulation of servants* in this province and territories, could not be considered as embracing apprentices.  If this last act does not, it is equally clear, that the acts of 1701 and 1729-30, already referred to on the subject of marrying servants, cannot be extended to apprentices.   But among other things, it is stated in the preamble of this act of the 29th of *September*, 1770, for the regulation of apprentices, that there was *no law to prevent their absenting themselves from their masters' or mistresses' service without leave.*   Now it is evident, that this was not true, if the term " servants" as used in our acts of assembly, and used too without any qualifying or restrictive adjunct or phrase, be sufficient, and does include *apprentices,* because the very words of the fourth section of the act of 1770, (1 *Sm. L.* 10,) for the better regulation of *servants* in this province, are " and *for the prevention of servants quitting their masters' service,* be it enacted, That if any *servant* shall absent himself or herself from the service of their master or owner for the space of one day or more, without leave first obtained for the same, every *such servant shall, for such day's absence, be obliged to serve five days after the expiration of his or her time,* &c."   And in addition to this, a fee of ten shillings was allowed to any one, who shall take up or apprehend a *runaway servant.* Again, to establish what I have before said, I refer to the sixth section of the act of 1700 for the regulation of servants, and the 4th section of the act of 1770, for the regulation of apprentices, imposing a penalty on such as conceal, entertain or harbour them, and by comparing these sections, it will be seen that the latter is substantially the same with the former, only that the term *servant* is used in the one and *apprentice* in the other, a thing altogether unnecessary, if the term " servants" had been understood to embrace and include apprentices in our legislative enactments.   But while the legislature thought there was no difference between the person, who should harbour and conceal a servant, and him, who should harbour and conceal an apprentice, having made the punishment the same, it is obvious, that they have made a great distinction between the punish-

(Altemus *v.* Ely.)

ment to be inflicted upon an *absconding servant*, and that which is to be inflicted upon an *absconding apprentice*. In the case of the first, they have made him liable to serve five days for every one lost by his absenting himself without his master's leave, and to pay such damages in further satisfaction to his master or mistress as the court shall think proper to award, but in the case of the apprentice, the court can only imprison and confine him to hard labour in case he should seem to be refractory and unwilling to return to a faithful discharge of his duty. Also another very important distinction is made in favour of the apprentice by this act of the legislature for regulating apprentices, that has never been extended to *servants*. The court of quarter sessions of the proper county is thereby authorised to discharge an apprentice from his apprenticeship and from all obligation contained in the indenture upon his part, if the court shall see, that the master or mistress has misused, abused, or evilly treated, or shall not have performed his or her duty towards, the apprentice. From a fair exposition of all these acts of assembly on this subject, I feel satisfied, that apprentices were not intended to be embraced under the term " servants," which is used in the acts of 1700 and 1729-1730, as contended for by the plaintiff's counsel.

So far as we have any judicial lights upon this subject in this state, it appears to me, that they are rather against what the plaintiff's counsel contends for in this case. The *Commonwealth* v. *Keppele*, 1 *Yeates*, 233, determines a servant in *Pennsylvania* to be a very different person from an apprentice, and denies all power to a guardian to bind out his ward as a servant, or to a parent to transfer a right to the service of his child, who is a minor, to pay the father's debt: yet for the purpose of making the ward or the child an apprentice, such authority does exist. In *Zieber* v. *Boos*, 2 *Yeates*, 321, the point, which is made in this case, was not decided. The court merely adjudged that the minor, who was married by the defendant, not being either the servant, or the apprentice, or the child of the plaintiff, he could not maintain the action. But the decision of the Supreme Court of this state in the case of *Norris* v. *Pilmore*, 1 *Yeates*, 405, establishes the right of the parent to recover the penalty of fifty pounds for marrying her minor son, who was at the time an apprentice to another person. Again, it has been decided in the case of *Hill* v. *Williams*, 14 *Serg. & Rawle's Rep.* 287, that but one penalty can be recovered under this act. These two cases came pretty near, if not quite, to deciding the present case in favour of the defendant. It is reasonable and certainly very expedient, that the person, who is entitled to demand and receive the penalty should be certain, and that the act should receive such a construction as to render it certain who he is. If then it be the point according to the decision in *Norris* v. *Pilmore*, and but one penalty can be recovered for the marriage of the same person, the necessary conclusion is, that this suit was not maintainable. But to say that the master of an apprentice should recover the penalty, would be to

(Altemus *v.* Ely.)

decide that a justice of the peace, clergyman or other person, may with impunity marry the minor child of a father or mother, without their consent, if such minor be an apprentice at the time, and his master or mistress give consent. I cannot persuade myself, that the good sense and feeling of the legislature of this state could have intended to substitute the consent of the master or mistress of a minor apprentice for that of the parent in a matter which not only concerned the welfare and happiness of the minor himself, but the well being and happiness of his parents, and which was to endure, not merely during the apprenticeship, but throughout life. So far as we have any judicial authority bearing upon the question in this case, I think, it is in favour of the defendant: and I would further observe, that there does not seem to be any strong reason for extending the provisions of these acts against clandestine marriages to apprentices, and giving to their masters a right to recover the penalties as the party aggrieved, because they always have it in their power to protect and secure themselves against loss or damage, or loss that may be sustained by their apprentices getting married without their consent, in the contract creating the apprenticeship. They can always have the covenant of the apprentice and the parent as an indemnity if required; and where there is no parent, they can, often, in addition to the covenant of the apprentice himself, obtain that of the guardian, or some friend as a security against future damage arising from such a cause. Indeed, it does not appear often to be the occasion of actual injury or loss to the masters or mistresses of apprentices, or we should hear much more of it than we do.

Houston, J. dissented.

Judgment affirmed.